**WO**                                                                                           SVK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Juan F. Delacruz, | No. CV 11-1745-PHX-GMS-MEA |
| Plaintiff, | |
| vs. | **ORDER** |
| Charles Ryan, et al., | |
| Defendants. | |

Plaintiff Juan F. Delacruz, an inmate confined by the Arizona Department of Corrections (ADC), filed this *pro se* civil rights action. (Doc. 9.) Defendant ADC Director Charles Ryan moves for summary judgment.[1] (Doc. 30.)

The Court will grant the motion and terminate the action.

**I.   Background and Summary of Motion**

In his Amended Complaint, Plaintiff alleges that his Eighth Amendment rights were violated when Ryan was deliberately indifferent to inmates' serious medical needs by allowing contracts with outside medical providers to expire. Plaintiff suffered a broken hand and "went a significant amount of time with a make shift splint before an actual doctor's visit." (Doc. 9 at 3.) Plaintiff claims that the delay in treatment caused permanent nerve

---

[1] Pursuant to Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998) (*en banc*), the Court notified Plaintiff of his obligation to respond to the motion for summary judgment. (Doc. 32.)

damage to his hand. He seeks money damages.

In his motion, Defendant argues that the evidence shows that (1) he was not deliberately indifferent because he did not "allow" the contract with St. Mary's to expire and Plaintiff received adequate medical care; (2) the Eleventh Amendment bars damages against Defendant in his official capacity; (3) Plaintiff is not entitled to punitive damages; and (4) Defendant is entitled to qualified immunity. (Doc. 30.) In support of this motion, Defendant submits his Statement of Facts (Doc. 31, DSOF)), his declaration (id., Ex. B), and the declaration of Richard Rowe, with numerous exhibits (id., Ex. C). In opposition, Plaintiff submits his 4-page response (Doc. 33) and exhibits; he submits no Statement of Facts.

## II.     Motion

### A.     Legal Standards

#### 1.     Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

1   When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any. See Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 248-49. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment").

### 2.  Medical Claim

To prevail on a claim under the Eighth Amendment for prison medical care, a prisoner must demonstrate "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). A plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. Jett, 439 F.3d at 1096 (citations omitted). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. Jett, 439 F.3d at 1096.

But mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983. Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir.

1980). Inadequate treatment due to malpractice or even gross negligence does not constitute an Eighth Amendment violation. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). Moreover, differences in judgment between an inmate and prison medical personnel regarding an appropriate medical diagnosis or treatment are not enough to establish a deliberate-indifference claim. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). In such a case, the inmate must show that the course of treatment the doctors chose was medically unacceptable under the circumstances. Id.

**B.      Parties' Contentions**

Although the Amended Complaint asserts the delay was due to the expired contract, Plaintiff does not pursue that theory in his response to Defendant's motion. Instead, Plaintiff argues that Ryan is responsible because he is the Director and because Plaintiff did not get treatment. (Doc. 33 at 1, 3.)

**1.      Facts**

The record establishes the following disputed and undisputed facts:

During the 2009 legislative session, Director Ryan became aware that the medical reimbursement rate that ADC can pay to outside providers could be reduced. (Doc. 31, DSOF ¶ 12.) Before passage of House Bill 2010, the ADC's Procurement Services Unit was in contact with its contractors, attempting to negotiate a reimbursement percentage and contract renewals. (Id.) House Bill 2010 passed and included a lower reimbursement percentage than was expected. (Id.) ADC continued to negotiate with its medical contractors with the hope that the Legislature would revise the bill in its next special legislative session. (Id. ¶ 14.) Carondelet Health Network (CHN) and Maricopa Integrated Health Systems (MIHS) cancelled their inpatient and outpatient specialty services contracts with ADC in November 2009 due to their refusal to accept Arizona Health Care Cost Containment System (AHCCCS) rates as mandated in Ariz. Rev. Stat. § 41-1608. (Id. ¶ 15.)

Beginning in November 2009, the Department's Procurement Services Unit, initiated discussions with various hospitals, clinics, and medical providers for their services for all specialties when it became apparent that currently contracted vendors were not interested in

- 4 -

renewing their contracts. (Id. ¶ 16.) ADC issued a request for bids for services on November 19, 2009. (Id. ¶ 17.) On an emergency basis, the ADC entered into direct contracts for limited hospital and outpatient specialty services on a case-by-case basis. (Id. ¶ 18.)

In December 2009, the ADC Health Services Bureau contacted AHCCCS providers and created a list of specialty providers who were willing to see ADC inmates at AHCCCS rates. (Id. ¶19.) This list was first distributed to the facilities in early January 2010, and was updated on a regular basis until July 1, 2012, the day that the ADC Health Services contract with Wexford Health Sources Inc. (Wexford), a correctional healthcare company, was implemented. Under this contract, Wexford was to provide onsite and offsite medical, dental, pharmacy, mental health, and the administration of third-party services to ADC inmates.[2]

On or about January 5, 2010, the ADC Health Services Bureau was able to informally engage the services of Dr. Champagne of the AZ Center for Hand Surgery. (Id. ¶ 20.) New inpatient hospital contracts were established beginning in April 2010, and existing contracts with vendors who were interested in renewing the contracts were renewed or extended. (Id. ¶ 21.) ADC entered into a contract with Abrazo Health Care, University Physicians Healthcare (UPH) on April 15, 2010, and Iasis Healthcare on July 6, 2010, to provide inpatient and/or outpatient medical services to ADC inmates. (Id. 22.)

Defendant asserts that Plaintiff reportedly injured his right hand on September 8, 2009, when he was working. (DSOF ¶ 35.) He continued to work because he could move his hand. (Id. ¶ 36.) He was seen that day at medical, where a splint was applied and he was given ibuprofen and ice. (Id. ¶ 38.) On September 8, 2009, Dr. Belcourt requested an x-ray of Plaintiff's right ring finger. (Id. ¶ 39.) Plaintiff asserts that there is no proof that Belcourt saw him on September 8, 2009. (Doc. 33 at 2.)

The x-ray was taken on September 10, 2009, and revealed findings consistent with a fracture of the distal 4th metacarpal. (DSOF ¶ 38.) On September 11, 2009, Dr. Belcourt

---

[2]The contract between Wexford and ADC has been cancelled.

1 requested an x-ray of the right hand ring finger while splinted; the x-ray was taken on September 14, 2009, and revealed a healing fracture of the 4th metacarpal with diminished angulation. (Id. ¶ 40.) At a follow-up on September 15, 2009, Dr. Belcourt discussed options with Plaintiff; specifically, he would likely have mild loss of the knuckle prominence. (Id. ¶ 41.) Plaintiff did not want surgery; the treatment plan included reinforcing the splint from hand to forearm with a fiberglass cast and a follow-up in one week. (Id. ¶ 41.)

On September 24, 2009, Plaintiff was seen by Physicians' Assistant (PA) Chitwood for a follow-up of the fracture of the 4th finger on the right hand. (Id. ¶ 43.) Chitwood observed that Plaintiff had a cast placed on his right arm, his thumb had full range of motion, capillary refill [blood flow check] all fingers, and there was no numbness. (Id.) The plan was to obtain an x-ray of the 4th digit on the right hand and to discuss the next course of action with the other providers and Dr. Belcourt. (Id.) On September 25, 2009, Chitwood explained the need to re-x-ray and the placement of a new cast if it was warranted by the x-ray. (Id. ¶ 44.) The x-ray taken on October 1, 2009, showed evidence of an impacted distal 4th metacarpal fracture. (Id. ¶ 45.) A posterior splint was applied, and Chitwood submitted an Outside Consult Request dated October 8, 2009, requesting an ortho consult. (Id. ¶ 45, 46.) It was approved on or about November 2, 2009. (Id. ¶ 47.)

On January 22, 2010, Chitwood noted pain and swelling of the fourth metacarpal and that Plaintiff was unable to fully extend the finger. (Id. ¶ 48.) An x-ray on January 28, 2010, revealed a healed distal 4th metacarpal fracture. (Id. ¶ 49.) Dr. Baird suggested contacting the Clinical Coordinator about the ortho appointment. (Id. ¶ 50.) It was noted that splinting the hand would hinder healing and limit mobility. (Id.)

Dr. Champagne of the Arizona Center for Hand Surgery saw Plaintiff on February 3, 2010, and noted no visible deformity, a 2.0 cm lag in flexion, and some impaired radial collateral ligament function. (Id. ¶ 51.) Plaintiff was to do therapy on the yard, and Dr. Champagne noted he would obtain an MRI to look for the extensor tendon to see if it was subluxing or split. (Id.) Dr. Champagne reviewed three radiographs of the right ring finger;

1 his impression was "[i]mpacted ring finger neck fracture, metacarpal, with healing and about 30 degrees of angulation." (Id.)

An MRI on May 11, 2010 revealed a "healed slightly impacted and angled 4th metacarpal neck fracture," and "mild tendinopathy of the extensor tendon to the with healing and about 30 degrees of angulation." (Id. ¶ 53.)

On June 23, 2010, the MRI was reviewed; the plan was to continue with current care and a copy of the MRI report was to be sent to Dr. Champagne for review. (Id. ¶ 54.)

Plaintiff was seen by Dr. Bodell of the Arizona Center for Hand Surgery on July 26, 2010; Bodell noted "full flexion of the digits compositely, but even the ring finger he can flex almost completely even at the MP joint. [But] . . . there is an extension lag." (Id. ¶ 55.) Plaintiff complained of numbness in his ring finger, a lymph-type feeling without control involving the ring and small fingers and pain that radiated up to the mid-forearm, which did not have a specific pattern in terms of distribution nor the quality. Dr. Bodell determined that it was difficult to know why Plaintiff was having that much trouble. (Id. ¶ 55.)

Plaintiff was seen on September 1, 2010, and a splint was made and applied and an Special Needs order (SNO) for a splint was issued; it was noted to obtain the ortho notes from February 2010. (Id. ¶ 57.) An Electromyography (EMG) was done on September 29, 2010, by Dr. Sobczak which revealed evidence of moderate, left median neuropathy at the wrist; mild, diffuse, sensory peripheral polyneuropathy; and no electrical evidence of radiculopathy, plexopathy or myopathy. (Id. ¶ 58.)

Dr. Champagne saw Plaintiff again on October 21, 2010; he complained of inability to extend; Dr. Champagne noted that while it was felt that there could be an extensor tendon problem, an MRI showed an intact extensor. He recommended therapy and a follow-up in three months. (Id. ¶ 59.) Plaintiff asserts that at some unspecified time, Dr. Champagne told him that the break had healed and that to re-break it might cause more harm than good. (Doc. 33 at 2.) Plaintiff complains that he was not given physical therapy until December 12, 2011. (Id. at 3.)

Plaintiff was seen at ADC on November 1, when he complained of weakness and lack

of strength when closing his hand; it was noted that he was seen by a hand specialist and was suppose to get therapy. The plan was a non-standard issue carpal tunnel splint. (Doc. 31, DSOF ¶ 60.) On December 16, 2010, an SMSI was placed for heel cups and a carpal tunnel splint. (Id. ¶ 62.)

On February 4, 2011, Plaintiff was approved for an orthopedics consult follow-up after having received physical therapy. (Id. ¶ 63.) On February 9, 2011, Plaintiff was approved for a physical therapy consult. (Id. ¶ 64.)

An x-ray of Plaintiff's right hand on March 8, 2011, revealed no evidence of a fracture or dislocation. (Id. ¶ 65.)

On March 15, 2011, Plaintiff was seen by Sky C. Moore, D.C. at Preferred Pain and Rehabilitation Center, who recommended a new EMG/NCV to the right hand testing the ulnar nerve and treatment three times per week for four weeks, to include physical therapy exercises to the right hand and manipulation and shearing to the right hand and wrist. (Id. ¶ 66.)

On March 17, 2011, Plaintiff saw Chitwood and claimed that he was never given take home physical therapy exercises – Doctor wanted range of motion exercises, three times a week for four weeks and a new EMG. (Id. ¶ 68.)

On March 25, 2011, PA Chitwood noted that she discussed the physical therapy consult with the MRC and that the recommendation for an EMG/NCV was not indicated because Plaintiff had an EMG on September 29, 2010. Dr. Baird was to discuss the referral with Central Office, and it was noted that Plaintiff may need an additional referral to physical therapy for exercises. (Id. ¶ 69.) Plaintiff was seen on April 5, 2011, when Chitwood discussed the physical therapy consult and therapy with him; she needed to see if he could be referred back to alternate physical therapy for evaluation and exercises. In the meantime, she ordered a Thera-band and a stress ball for Plaintiff to exercise with. (Id. ¶ 71.)

On April 7, 2011, Chitwood submitted an Outside Consult Request for a physical therapy consult. (Id. ¶ 72.) Plaintiff signed an Inmate Outside Appointment Agreement on April 8, 2011, agreeing to attend a physical therapy consult if the consult was approved by

- 8 -

1 the MRC. (Id. ¶ 73.) Plaintiff had an outside ortho consult with Dr. Faibisoff on April 19,
2 2011; it was Dr. Faibisoff's impression that Plaintiff had the following: malunion of the right
3 4th metacarpal fracture with some extension lag. There were no treatment recommendations.
4 (Id. ¶¶ 72-74.)

5 On June 7, 2011, Plaintiff was approved for an evaluation to provide him with a home
6 exercise regime and he was seen at Physical Therapy USA by therapist Deibler on June13,
7 2011. (Id. ¶¶ 75-76.) On June 14, 2011, an SNO was issued for Plaintiff for a carpal tunnel
8 splint and a stress ball for the duration of his confinement. (Id. ¶ 77.)

9 On July 15, 2011, LPN Hayes issued a one year SNO for Plaintiff for a Theraband for
10 his right hand and on July 22, 2011, Plaintiff was approved for a physical therapy follow-up.
11 (Id. ¶¶ 79,80.) On December 12, 2011, Plaintiff was seen at Desert Hand Therapy by
12 Certified Hand Therapist Richard Standage. He was assessed with "intrinsic weakness
13 associated with RF [Flexor Carpi Radialis] and SF [Flexor Digitorium Superficialis], possible
14 neuropathy dorsal branch ulnar nerve affecting dorsal sensation." (Id. ¶ 81.) Plaintiff was
15 given home exercises for strengthening and ulnar nerve gliding. (Id.)

16 **C.   Analysis**

17 The Court will grant summary judgment to Defendant. Defendant submits evidence
18 that Plaintiff was seen by health care professionals following his injury and that he received
19 follow-up care. Although Plaintiff disputes that the care was adequate, he presents no
20 evidence that the care was medically unacceptable under the circumstances. Moreover, there
21 is nothing to connect Defendant to any alleged harm. Therefore Plaintiff fails to create a
22 triable issue of fact as to Defendant's liability.

23 As noted, Plaintiff provides only a brief response to Defendant's motion; the Court
24 has summarized the few facts on which Plaintiff relies. He also attaches many pages of
25 exhibits, which he labels "supporting facts." (Doc. 33 at 5.) These include medical records,
26 medical reports, and Plaintiff's grievances. But "[j]udges need not paw over the files without
27 assistance from the parties." Orr v. Bank of America, 285 F.3d 764, 775 (9th Cir. 2002)
28 (quoting Huey v. UPS, Inc., 165 F.3d 1084, 1085 (7th Cir. 1999).) On a motion for summary

- 9 -

1 judgment, a district court does not have the duty to search for evidence that would create a
2 factual dispute. Bias v. Moynihan, 508 F.3d 1212, 1219 (9th Cir. 2007). A district court
3 lacks the authority to act as a party's lawyer, even for pro se litigants. Id.

4 Although Plaintiff claims that there is no record that Belcourt saw him on September
5 8, 2009, Defendants, in fact, asserted that Belcourt ordered an x-ray on that date, and there
6 is evidence of that (Doc. 31-2 at 30); Plaintiff does not dispute that he had an x-ray on
7 September 10. Plaintiff claims that he did not refuse surgery but that Dr. Champagne told
8 him that the break had already healed—as noted, it is unclear when any of this allegedly
9 occurred. In his Amended Complaint, Plaintiff alleged that he was not seen by a health care
10 provider because Defendant had allowed the health care contract to expire. But the evidence
11 shows that Plaintiff was injured on September 8, 2009, and the contract was not cancelled
12 until November, 2009. Plaintiff does not dispute that he saw Dr. Belcourt on September 15.
13 Plaintiff saw Dr. Champagne in February 2010 after Plaintiff had received several x-rays, had
14 his finger splinted, and his hand placed in a cast. There is no evidence of deliberate
15 indifference.

16 Plaintiff suggests that the care was inadequate, but he provides no evidence that the
17 care was medically unacceptable under the circumstances. See Jackson, 90 F.3d at 332. It
18 was incumbent upon Plaintiff to provide an affidavit or deposition of an expert to establish
19 that the care was medically unacceptable. See Hutchinson v. United States, 838 F.2d 390,
20 393 (9th Cir. 1988) (granting summary judgment against a plaintiff who relied only on her
21 own allegations and conclusory statements that defendants had been negligent and who failed
22 to provide affidavits or depositions of experts). Plaintiff also complains that he waited for
23 months for physical therapy; a February 2010 report from Dr. Champagne indicates that he
24 will write Plaintiff a prescription for therapy, which Plaintiff will do "in the yard." (Doc. 33
25 at 10.) It is unclear whether the prescription was written at that time, but Plaintiff provides
26 no evidence that any delay in receiving therapy was attributable to Defendant. Defendant
27 is the Director of ADC, not a health-care provider. See Rizzo v. Goode, 423 U.S. 362, 371-
28 72, 377 (1976) (to prevail on a claim under § 1983, a plaintiff must demonstrate that he

suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant.)

Moreover, in his response Plaintiff does not dispute any of the allegations regarding the efforts by ADC to secure health care providers after cancellation of the contract. Rather, Plaintiff asserts that Defendant is responsible because he is the Director. (Doc. 33 at 1, 3.) But there is no *respondeat superior* liability under § 1983, and, therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. Monell v. New York City Dep't. of Soc. Servs., 436 U.S. 658, 691-92 (1978). To prevail on a claim against a supervisory official, the civil rights complainant must allege that the supervisory official personally participated in the constitutional deprivation or that the supervisory official was aware of widespread abuses and, with deliberate indifference to the inmate's constitutional rights, failed to take action to prevent further misconduct. See Ortez v. Washington County, Or., 88 F.3d 804, 809 (9th Cir. 1996); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); King v. Atiyeh, 814 F.2d 565, 568 (9th Cir. 1987); see also Monell, 436 U.S. at 691. Plaintiff fails to show that Defendant personally participated in any constitutional deprivation or was aware of widespread abuses and failed to take action.

The Court will grant summary judgment to Defendant and terminate the action.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 30).

(2) Defendant's Motion for Summary Judgment (Doc. 30) is **granted**.

///
///
///
///
///
///

1     (3) The action is terminated, and the Clerk of Court must enter judgment accordingly.

2     DATED this 19th day of March, 2013.

*A. Murray Snow*
G. Murray Snow
United States District Judge